Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Feb 06 2013, 9:17 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JOANN M. PRICE**
Pauper Appellate Attorney
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**EUGENE M. VELAZCO, JR.**
Indiana Department of Child Services
Lake County Office
Gary, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of C.D., and A.D., minor children, and S.D., the mother, <br><br> S.D., <br><br>     Appellant-Respondent, <br><br>     vs. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>     Appellee-Petitioner. <br><br>     and <br><br> LAKE COUNTY C.A.S.A., <br><br>     Co-Appellee. | No. 45A03-1205-JT-242 |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Mary Beth Bonaventura, Judge
Cause No. 45D06-1101-JT-26 and -27

**February 6, 2013**
**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

S.D. ("Mother") appeals the involuntary termination of her parental rights to her children, C.D. and A.D. Mother challenges the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of C.D., born in January 2006, and of A.D., born in August 2008.[1] The facts most favorable to the trial court's judgment reveal that, in July 2009, the local Lake County office of the Indiana Department of Child Services ("LCDCS") received a referral alleging C.D. had been "taken to the emergency room for diarrhea, a fever, and irritation in the vaginal area." *Tr.* at 31. In addition, hospital medical staff was concerned that C.D.'s "vulva lesions" were genital herpes.[2] *Id.* at 32.

LCDCS initiated an assessment and spoke with Mother at the hospital. Mother claimed she did not know how C.D. could have contracted genital herpes because she was the child's sole care provider. Mother soon recanted, however, and reported that her live-in boyfriend ("L.B.") and alleged biological father of A.D. also occasionally provided care for C.D. Mother also admitted that she had used marijuana and cocaine for the past eleven years and that she was currently using Vicodin and Xanax, although Mother could not provide a valid prescription for either of these drugs at the time. In

---

[1] It appears from the record that C.D.'s alleged biological father, H.H., died from a drug overdose prior to the commencement of these proceedings. A.D.'s alleged biological father is L.B. The juvenile court terminated both alleged father's parental rights to their respective children, and the fathers do not participate in this appeal. We therefore limit our recitation of the facts to those facts pertinent solely to Mother's appeal of the termination order.

[2] Medical staff further reported that no vaginal trauma was assessed and that C.D.'s hymen remained intact.

addition, the LCDCS assessment case manager learned that Mother, L.B., and the children had been living with the maternal grandparents along with several additional adult friends and relatives of Mother. Due to concerns regarding Mother's admitted drug use in the family home, lack of supervision of the children, and possible sexual abuse of C.D., LCDCS took both C.D. and A.D. into emergency protective custody. Approximately two days later, the results of C.D.'s culture came back positive for genital herpes.

LCDCS filed petitions, under separate cause numbers, alleging C.D. and A.D. were children in need of services ("CHINS"). Mother admitted to the allegations of the CHINS petition, and the children were so adjudicated. Following a dispositional hearing in September 2009, the juvenile court issued an order formally removing C.D. and A.D. from Mother's care and custody and a making the children wards of LCDCS. The court's dispositional order also directed Mother to participate in and successfully complete a variety of tasks and services designed to address her parenting deficiencies. Among other things, Mother was ordered to: (1) complete psychological, psychiatric, and drug and alcohol evaluations and follow all resulting recommendations; (2) submit to requests for random drug screens, including hair follicle testing; (3) participate in individual and family counseling; (4) complete parenting classes; (5) exercise regular supervised visitation with the children; and (6) complete home-based counseling services upon reunification with the children. In addition, all current household members were ordered to submit to sexually- transmitted disease ("STD") testing.

3

Mother's participation in court-ordered services was sporadic throughout the CHINS case and ultimately unsuccessful. Mother and L.B. both tested positive for genital herpes, as did several other adults who were living in the family home. Although Mother participated in parenting classes and substance abuse counseling, she consistently tested positive for drugs, including marijuana, cocaine, and opiates.[3] Mother also began in-patient substance abuse treatment in April 2011, but left the program against medical advice after only ten days. Mother continued to use drugs after leaving the in-patient program and, most recently, tested positive for methadone and amphetamine in February 2012. In addition, although C.D. had identified L.B. as the perpetrator of her sexual abuse, Mother refused to believe C.D., continued to have a relationship with L.B., and became pregnant by L.B. two additional times during the underlying proceedings. In each instance, Mother admitted to having used cocaine and other drugs during her pregnancies, and both babies were removed by LCDCS. As for Mother's participation in supervised visits with C.D. and A.D., Mother oftentimes appeared for visits while under the influence of drugs. She also struggled to stay engaged during visits and had to be redirected by visit supervisors to pay attention to the children.

Eventually, LCDCS filed petitions seeking the involuntary termination of Mother's parental rights to both children. A consolidated evidentiary hearing on the termination petitions was held in March 2012. During the termination hearing, LCDCS presented substantial evidence establishing that Mother had failed to successfully

---

[3] L.B. initially participated in some court-ordered services and drug testing but had discontinued all communication with LCDCS and service providers by September 2009.

4

complete and/or benefit from a majority of court-ordered reunification services available throughout the underlying CHINS and termination cases. In addition, LCDCS established that Mother had failed to overcome her addiction to drugs and remained incapable of providing the children with a safe, stable, and drug-free home environment. As for the children, LCDCS presented evidence showing that neither child had developed a significant bond with Mother. In addition, both children were bonded with their current pre-adoptive foster families, and C.D.'s behavior and emotional well-being was improving in the loving and stable environment of her current foster home.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. On March 26, 2012, the court entered its judgment terminating Mother's parental rights to C.D. and A.D. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

5

Here, in terminating Mother's parental rights, the juvenile court entered specific findings and conclusions. When a juvenile court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

6

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[4] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the juvenile court finds that the allegations in a petition described in Indiana Code section 31-35-2-4 are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Mother challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) of the termination statute cited above.[5]

## I. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires the trial court to find that only one of the three requirements of subsection (b)(2)(B) has been established by clear and

---

[4] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

[5] To the extent that Mother argues that the juvenile court's findings are insufficient to support a determination that termination of her parental rights is in the children's best interests and that LCDCS failed to prove it had a satisfactory plan for the future care and treatment of the children, she has waived these arguments on appeal. Mother fails to appropriately develop or support these allegations, as they merited only conclusory sentences in her Appellant's Brief. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring conclusions to be "supported by cogent reasoning" and "citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on").

convincing evidence before terminating parental rights. Here, the juvenile court determined that LCDCS established, by clear and convincing evidence, subsections (b)(2)(B)(i) and (ii) of the termination statute. Because we find it to be dispositive under the facts of this case, we shall consider only the former requirement, namely, whether LCDCS sufficiently established that there is a reasonable probability the conditions resulting in C.D.'s and A.D.'s removal or continued placement outside of Mother's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The juvenile court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, LCDCS was not required to provide evidence ruling out all possibilities of change; rather, it needed to establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother asserts on appeal that the juvenile court's findings are "mere generalizations based on gross speculation about the alleged perpetrator of the incident against [C.D.]." *Appellant's Br.* at 8. Mother further states that she "removed herself" from the home where she "cohabitated with the group of potential assailants" and no longer had a relationship with L.B. at the time of the termination hearing. *Id.* at 9. Mother therefore insists she is entitled to reversal because the juvenile court "based its conclusions on speculation and a gaggle of competing theories." *Id.* at 10.

In terminating Mother's parental rights, the juvenile court made detailed findings regarding Mother's significant, unresolved substance abuse issues, history of neglectful parenting, and failure to fully engage in and/or benefit from court-ordered reunification services. Specifically, the court noted the circumstances surrounding the children's removal, including that there were "numerous adults in the home over a short period of time," that Mother "admitted to having a drug problem that extended approximately eleven years," and that Mother tested positive for "marijuana, opiates[,] and cocaine" at the detention hearing. *Appellant's App.* at i. The court also found that at the time of the children's removal, then three-year-old C.D. had been "diagnosed with genital herpes" and that Mother had failed to keep her children safe." *Id.*

Regarding Mother's participation in court-ordered reunification services, the juvenile court noted that despite a wealth of services made available to her for nearly three years, Mother "continued to test positive for drugs consistently since August 2009," failed to successfully complete "any case plan for reunification," and "is in no position to properly parent these children." *Id.* at ii. As for the children, the court found that

9

"[n]either parent is providing any emotional or financial support for the children," neither child had been "returned to parental care" throughout the underlying proceedings, Mother "cannot remain drug[-]free," and that the children continue to need extensive therapy due to their exposure to sexual abuse which is "unlikely to be provided if they were in [M]other's care due to [M]other's denial." *Id.* Based on these and other findings, the juvenile court concluded that there is a reasonable probability the conditions resulting in the removal of C.D. and A.D. from Mother's care will not be remedied. Our review of the record leaves us convinced that abundant evidence supports the juvenile court's findings cited above.

The record clearly establishes that Mother failed to achieve any significant, long-term improvement in her ability to protect, care for, and parent the children. Moreover it was the general consensus of case managers and service providers that Mother's ability to overcome her addiction to drugs and to safely parent C.D. and A.D. would likely not improve. During the termination hearing, LCDCS case managers Johnnett Roby ("Roby") and Tashima Jones ("Jones") confirmed Mother's extensive history of drug use both before and during the underlying proceedings, failure to complete and/or benefit from court-ordered services, and refusal to believe C.D.'s consistent allegations that L.B. had sexually abused her. To that end, Roby informed the court that when confronted with the fact C.D. might have genital herpes, Mother did not appear to be "shocked" or "concerned," but instead "just stated she did not know as to how [C.D.] contracted it. . . . [A]s if it wasn't a big concern to her at the time." *Tr.* at 43. Roby and Jones also acknowledged that Mother "openly admitted" to having used cocaine while being

10

pregnant with at least one of the children's younger siblings, and that the random drug screen and substance abuse treatment services available to Mother throughout the underlying CHINS proceedings were all eventually closed as unsuccessful due to Mother's "noncompliance." *Id.* at 56, 58. Moreover, Jones confirmed that Mother "has not alleviated her drug abuse" and that she recently informed the drug-screen service provider in one of the children's sibling's cases that she was "not going to do anymore services" and that she was "done with you people." *Id.* at 58, 60.

When asked why she believed Mother would be unable to protect the children in the future, Jones testified that Mother had failed to protect C.D. throughout the "entire case." *Id.* at 65. Jones further explained that Mother "still doesn't take ownership as to what happened with [C.D.], and she still says that she's . . . done nothing wrong, and that she fails to understand that she has failed to protect her child." *Id.* Jones further informed the juvenile court that as of the time of the termination hearing Mother was not "in any position to parent any child." *Id.* at 72.

As noted above, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, the record makes clear that, throughout the underlying proceedings, Mother demonstrated a persistent unwillingness and/or inability to take the actions necessary to

show that she is capable of providing C.D. and A.D. with the safe, stable, and drug-free home environment the children need to thrive. Based on the foregoing, we conclude that the juvenile court's determination that there is a reasonable probability the conditions leading to the children's removal from the family home will not be remedied is supported by clear and convincing evidence. Mother's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. *D.D.*, 804 N.E.2d at 265.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (*quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

MATHIAS, J., and CRONE, J., concur.